**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| WC 1899 MCKINNEY AVENUE, LLC, | § | |
| a Delaware Limited Liability Company, | § | |
| *Plaintiff/Counterclaim Defendant*, | § | |
| | § | |
| vs. | § | Civil Action No. 1:17-cv-00687 |
| | § | |
| STK DALLAS, LLC, a Texas LLC; and | § | |
| THE ONE GROUP HOSPITALITY, INC., | § | |
| a Delaware corporation, | § | |
| *Defendants/Counterclaim Plaintiffs*. | § | |
| | § | |
| vs. | § | |
| | § | |
| WORLD CLASS CAPITAL GROUP, LLC, | § | |
| NATIN PAUL AND SHEENA PAUL, | § | |
| *Third-party Defendants*. | § | |

**PLAINTIFF AND THIRD-PARTY DEFENDANTS'**
**AMENDED MOTION FOR SUMMARY JUDGMENT**

Plaintiff, WC 1899 McKinney Avenue, LLC ("Plaintiff" or "WC McKinney") and Third-Party Defendants World Class Capital Group, LLC, Natin Paul and Sheena Paul (collectively, the "WC Group") file this Amended Motion for Summary Judgment with respect to Plaintiff's claims for breach of contract set forth in their Second Amended Complaint, and with respect to Defendants' STK Dallas, LLC and The One Group Hospitality Inc.'s (together ("STK Group" or "Defendants")) counterclaims and third party claims, and would show as follows:

## I.   AMENDMENT TO ORIGINAL SUMMARY JUDGMENT

Plaintiff and Third-Party Defendants filed their original Motion for Summary Judgment on May 21, 2018 [ECF 57].  The Parties agreed and the Court has ordered that the deadline for Defendants to file their Response to the Motion for Summary Judgment be extended until June 22, 2018 [ECF 59]. Movants hereby submit this Amended Motion for Summary Judgment

in place of the prior Motion, in order to provide additional evidence and update the calculation of damages that have accrued through Defendants' breach of the Lease and associated Guaranty Agreement.

## II.   INTRODUCTION

1.      This is a motion for final summary judgment pursuant to FRCP 56. It is supported by the following summary judgment evidence:

Amended Affidavit of Barbara Lee and all exhibits attached and identified therein.

Affidavit of Maryann Norwood, and all exhibits attached and identified therein.

Affidavit of Natin Paul, and all exhibits attached and identified therein

Affidavit of Eric J. Taube, and all exhibits attached and identified therein.

2.      This action arises from Defendants' failure to pay all amounts due and owing under a Lease Agreement (the "Lease") (Exhibit 2-A) and an associated unconditional Guaranty (Exhibit 2-B).   The failure to pay constitutes a straightforward breach of these contracts by Defendants. Despite the express terms of the Lease and their initial payment of rent over several months, when faced with this litigation, Defendants have attempted to manufacture defenses, counterclaims and unsubstantiated third-party claims to obscure and avoid their plain obligations under the Lease and the Guaranty respectively.   However, the evidence in support of Plaintiff's and Third-Party Defendants' summary judgment affirmatively establishes that Defendants breached their Lease and Guaranty contracts, and that Plaintiff did not breach the Lease.

3.      The Defendants' excuses for non-payment set forth in their Affirmative Defenses and Original Counterclaims are specifically addressed and barred by the express terms of the Lease and Guaranty themselves. The Counterclaims for fraud and negligent misrepresentation are barred as a matter of law by the economic loss rule, are precluded by Defendants' specific

admissions contained in the Lease that preclude the assertion that Defendants relied upon the alleged representations that form the basis of their fraud and negligence claims and/or the statute of limitations. While the WC Group specifically deny that any misrepresentations were made, even assuming that any statements were made prior to the execution of the Lease as the Defendants allege, the terms of the Lease specifically and affirmatively establish that any reliance on any alleged misrepresentations cannot exist as a matter of law.

4.      Accordingly, the Court should grant summary judgment in favor of Plaintiff's claims for breach of contract and against Defendants' Counterclaims and third-party claims for breach of contract, declaratory judgment, fraudulent inducement, fraudulent concealment, and negligent misrepresentation.  Although Plaintiff specifically reserves the right to sue in a separate action for amounts that accrue after the rendition of the judgment in this case, the granting of this Motion for Summary Judgment disposes of all claims, counterclaims and third-party claims asserted in this matter.

### III.    RELEVANT UNDISPUTED FACTS

#### A.    Execution of the Lease and the Guaranty by Defendants

5.      Effective June 5, 2015, WC as Landlord and STK as Tenant entered into that certain Lease Agreement ("Lease") whereby Landlord leased to Tenant approximately 14,611 square feet of retail space located at 1899 McKinney Avenue, Dallas Texas 75201, and as more particularly described in the Lease (the "Demised Premises").  A true and correct copy of the Lease is attached hereto as **Exhibit 2-A**.

6.      To support Tenant's performance of its obligations under the Lease and to induce Plaintiff to enter into the Lease, The One Group Hospitality, Inc. ("The One Group") (a publicly traded entity), as Guarantor, executed a Limited Lease Guaranty whereby it guaranteed the

payment and performance of all Guaranteed Obligations under the terms of the Lease (the "Guaranty").[1]  A true and correct copy of the Guaranty is attached as **Exhibit 2-B** hereto.

7.      Prior to the execution of the Lease and the Guaranty, STK and One Group, through their Chief Executive Officer, Jonathan Segal, and public filings, represented to Plaintiff that they were sophisticated restaurant designers and operators, and specifically had experience in designing and construction of restaurants and lounge space in a variety of buildings, situations and jurisdictions all over the world.[2] Mr. Segal specifically represented that he, the One Group, and the various STK entities that One Group owned or controlled, knew how to investigate and work with a variety of situations and building conditions to ensure that they could effectively and efficiently analyze, design and operate their restaurant concept.[3]  During negotiations, it was well known by STK that depending upon the permitted use, the sufficiency of parking for the property could be an issue, and Mr. Segal represented that he believed that STK had already obtained sufficient parking arrangements prior to execution of the Lease.[4]

8.      In any event, the terms of the Lease and the Guaranty were extensively negotiated between the parties and their legal counsel, and were not merely a form lease.[5] Among the various terms of the Lease that were specifically negotiated and addressed, the parties specifically agreed to the following:

(i) a 60-day contingency period (the "Initial Contingency Period") lasting until August 3, 2015, during which STK Group could continue to conduct whatever investigations it

---

[1] The parties further agreed that the Guaranty is an absolute and unconditional guaranty of payment and performance of the Guaranteed Obligations, as defined therein, and that Guarantor's obligations are irrevocable and unconditional.  In addition, the parties agreed that the Guaranty is enforceable against the Guarantor without Landlord's exhaustion of remedies against the Tenant under the Lease.
[2] Exhibit 3, at ¶ 3.
[3] Id.
[4] Exhibit 3, at ¶¶ 4, 6
[5] Exhibit 3, at ¶¶ 3, 5.

desired and unilaterally terminate the Lease and Guaranty without liability, if they determined that the Premises could not meet their needs; (Exhibit 1-A, pp. 3-4)[6]

(ii) a specific statement that "Tenant hereby agrees and acknowledges that the Demised Premises **may not contain sufficient parking** for its Permitted Use;" (Exhibit 1-A, p. 4)

(iii) a conspicuous "entirety of agreement' clause which expressly disclaimed any prior representations not expressly set forth in the Lease; (Exhibit 1-A at p. 23);[7] and

(iv) an agreement that STK Group took the Premises in its "as-is" condition and acknowledged that it had previously inspected the premises to its satisfaction. (Ex 1-A at p. 4).").

9.      In addition to the above provisions, the parties agreed that the Rent Commencement Date was March 1, 2016, and that the term of the Lease was for a period of one hundred and twenty (120) months after the Rent Commencement Date ("Lease Term").[8] Pursuant to the Lease, STK agreed to pay certain monthly Rental amounts, which consisted of Minimum Guaranteed Rentals, Percentage Rentals, required payments for Real Estate Charges, Insurance Expenses, property management fees, and any other amounts due and payable by STK

---

6 Section 2.2(ii) of the Lease states:

    Notwithstanding anything in this Lease to the contrary, if the Demised Premises is unable to be used for the Permitted Use as evidenced by Tenant being unable to obtain the Permits to construct, open and/or to operate the Demised Premises for such use (despite using its commercially reasonable best efforts to obtain the same and provided that any such inability is not caused by the inactions of Tenant [e.g., there is a city-wide moratorium on granting such Permits]), then Tenant may notify the Landlord of the same by providing written notice to Landlord on or before August 3, 2015 (the "Initial Contingency Period"). In the event Tenant so notifies Landlord in writing that it reasonably believes it cannot obtain the Permits, Tenant may terminate this Lease upon written notice to Landlord on or before the expiration of the Initial Contingency Period.

7 Section 28.14 of the Lease states:

    "LANDLORD AND TENANT HEREBY ACKNOWLEDGE THAT THEY ARE NOT RELYING UPON ANY BROCHURE, RENDERING, INFORMATION, REPRESENTATION OR PROMISE OF THE OTHER, OR OF THE AGENT OR COOPERATING AGENT, EXCEPT AS MAY BE EXPRESSLY SET FORTH"

8 Further pursuant to the Lease, STK agreed to use its best efforts to cause the Opening Date of its business to occur on or before the Rent Commencement Date

under the Lease (collectively, "Rent"), on or before the first (1st) day of each calendar month following the Rent Commencement Date during the Lease Term.

### B. Expiration of the Initial Contingency Period and Defaults under the Lease and Guaranty

10.     The Initial Contingency Period expired on August 3, 2015. As of that date it is uncontested that STK sent no notice as required by the Lease to terminate the Lease and relieve the One Group from its Guaranty.[9]  In fact, both before and after the expiration of the Initial Contingency Period, STK signed a Subordination, Non Disturbance and Attornment Agreement as well as an estoppel certificate confirming that Plaintiff was not in default under the Lease.[10]

11.     There is no evidence that Defendants attempted to perform any diligence with regard to the parking issue during the initial Contingency Period.  The first indication that Defendants had not made the necessary arrangements for parking sufficient to operate their restaurant came on September 30, 2015, almost two months after the expiration of the Contingency Period.[11] This is despite the fact that Plaintiff made numerous efforts to contact the Defendants and ensure that their design, permitting and construction of the restaurant was on pace to open as required under the lease.

12.     On or about December 22, 2015, Landlord notified Tenant in writing that as a result of Tenant's failure to timely pursue the Permits and Tenant's Work required to commence business operations, as well as Tenant's failure to address its strategy for procuring parking

---

[9] See Exhibit 2-G; Exhibit 3, ¶ 6.

[10] See **Exhibit C-1,** at pp. 2-3 "Tenant certifies that there are no known defaults on the part of the Landlord, that the Lease is a complete statement of the agreement of the parties thereto with respect to the Premises, that the Lease is in full force and effect. Landlord and Tenant will each notify Lender of any default of Tenant or Landlord or any known circumstance or other known event arising under the Lease which would entitle or permit Landlord or Tenant to cancel the Lease or abate any rent payable thereunder. Tenant further agrees that notwithstanding any provision of the Lease, no notice, cancellation or termination thereof shall be effective unless Lender shall have received such notice and have failed within thirty (30) days after the expiration of the cure period provided to Landlord under the Lease, if any, to cure or commence to cure such default and thereafter diligently prosecute the same to completion"; **Exhibit C-2**

[11] See **Exhibit 2-G**

required for the Permitted Use and failure to remit drawings for the Demised Premises to Landlord, Tenant was not using commercially reasonable best efforts, as required by Section 9.1 of the Lease, to cause the Opening Date to occur on or before the March 1, 2016 Rent Commencement Date. The failure to use commercially reasonable best efforts was a default under Section 22 of the Lease.

13.     STK paid rent under the Lease from the Rent Commencement date through May 2016. After Tenant purposely stopped payment on their rent check on May 13, 2016, Landlord notified Tenant in writing that Tenant owed outstanding Rent and other charges in the amount of $47,537.07 (and as such amount continues to accrue, the "Delinquent Amount").  A true and correct copy of Landlord's May 16, 2016 correspondence is attached hereto as **Exhibit 2-D.**  As set forth in the Lease, Landlord notified Tenant that pursuant to Section 22.1(a) of the Lease, Tenant's failure to remit the Delinquent Amount within five (5) days constituted an Event of Default under Section 22 the Lease.

14.     On June 17, 2016, Landlord notified Tenant in writing that a lien had been filed on the Premises.  A true and correct copy of Landlord's June 17, 2016 correspondence is attached hereto as **Exhibit 2-E.**  As set forth in the Lease, Landlord notified Tenant that pursuant to Section 22.1(h) of the Lease, Tenant's failure to remove such lien within thirty (30) days constituted an Event of Default under Section 22 of Lease.

15.     On October 6, 2016, Landlord notified Guarantor regarding the Monetary Default.  A true and correct copy of Landlord's October 6, 2016 correspondence is attached hereto as **Exhibit 2-F**.  Landlord further notified Guarantor that as of October 6, 2016, the Delinquent Amount due for Rent and other charges had accrued to not less than $285,222.42. Landlord further notified Guarantor that, pursuant to the Lease, should Landlord fail to receive

the Delinquent Amount within five (5) days, Landlord would exercise all applicable remedies as provided in the Lease and/or applicable law.  Guarantor has failed and refused to remit amounts due and owing, which continue to accrue, under the Guaranty.

16.     On May 21, 2018, Plaintiff sent formal notice under Section 8.4 of the Lease that rent for the quarter beginning June 1, 2018 would be accelerated, and that advance payment for the subsequent three months will become due and owing on such date.  Therefore, as of May 21, 2018, the amounts due and owing to Plaintiff under the Lease and the Guaranty are $1,525,250.97 (exclusive of attorneys' fees and costs). See Exhibit 1-1.  A true and correct copy of the notice is attached hereto as Exhibit 2-H and incorporated by reference herein. Additionally, Plaintiffs are entitled to their reasonable attorneys' fees incurred in connection with this matter under the terms of the Lease and the Guaranty, which are as of this date $66,000. [12]

## IV.     ARGUMENT AND AUTHORITY

### A.     Summary Judgment Standard

17.     Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Washburn v. Harvey*, 504 F. 3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted).

---

[12] See Exhibit 1 and Exhibit 4 (affidavit of Eric J. Taube)

18.     Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006).

19.     As set forth above, the evidence shows that the Defendants stand in material breach of the Lease and the Guaranty, and that the specific terms of the Lease and the Guaranty bar their affirmative defenses and counterclaim. Additionally, and/or alternatively, the Defendants have no evidence of their affirmative defenses and counterclaims.

**B.      The Defendants have breached their respective contracts**

20.     The essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.); *Compass Bank v. Sunbelt Multimedia Co.*, No. H-11-964, 2014 U.S. Dist. LEXIS 160056, at *11 (S.D. Tex. 2014)

21.     To recover on a guaranty contract, a plaintiff must show: (1) the existence and ownership of the guaranty contract; (2) the terms of the underlying contract by the holder; (3) the occurrence of the condition upon which liability is based; and (4) the guarantor's failure or

refusal to perform the promise. *Lee v. Martin Marietta Materials Sw., Ltd.*, 141 S.W.3d 719, 720-21 (Tex. App.—San Antonio 2004, no pet.).

22.     As set forth above, it is undisputed that the parties executed a valid Lease and associated Guaranty, which called for, among other things, the commencement of rent under the Lease to begin on March 1, 2016, and for the One Group to use commercially reasonable best efforts to open its restaurant prior to the Rent Commencement Date, while avoiding the placement of any liens upon the Property owned by Plaintiff WC McKinney.  The One Group absolutely and unconditionally agreed to guaranty the payment and performance of each of these Guaranteed Obligations under the terms of the Lease. It is uncontested that Defendant STK failed to terminate the Lease during the applicable period.

23.     At all times, Plaintiff performed its obligations under the Lease by granting quiet and peaceful possession of the Property pursuant to all agreed terms between the parties.

24.     Defendant STK is in default under the Lease because it breached its obligation to pay rent in the amounts agreed by the parties; to use commercially reasonable best efforts to open its restaurant, and to avoid the placement of any liens upon the property.  Plaintiff has properly notified Defendants of its breaches multiple times as required under the Lease, and has since accelerated - on a quarterly basis in accordance with the Lease - all monetary obligations currently due and owing under the Lease.

25.     In addition, despite demand, the evidence shows Defendant One Group has wholly failed to perform its payment obligations under the Guaranty.

26.     As a result of these breaches of the parties' agreement, as of May 21, 2018, Plaintiff has been damaged in the amount of $1,525,250.97 plus reasonable and necessary attorneys' fees and costs of $66,000. Rent continues to accrue under the Lease, and therefor

under the Guaranty, at the rate of $131,122.11 per quarter continuing on September 1, 2018. The

Plaintiff specifically reserves the right to sue upon any additional amounts that may accrue under

the Lease and the Guaranty as they come due under the provisions of those agreements.

### C.    The Defendants have no evidence of their Affirmative Defenses and Counterclaims

27.    The Defendants have alleged, without factual support or the requisite specificity

of pleading,[13] the affirmative defenses of (i) failure to mitigate damages; (ii) waiver;[14] (iii)

release;[15] (iv) estoppel;[16] (v) laches;[17] (vi) unclean hands;[18] (vii) failure to satisfy an

(unidentified) condition precedent; and (viii) fraudulent inducement. [ECF 15] The Defendants

have no evidence to support the essential elements of these affirmative defenses and the deadline

to conduct discovery in this lawsuit is April 30, 2018. [ECF 17] Under FED. R. CIV. P. 56,

without evidence to support the specific elements of their affirmative defenses, they must be

dismissed. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005) ("On summary

---

[13] A number of cases have concluded that, as with affirmative defenses like waiver, release and unclean hands, the simple listing of estoppel "falls well short of the minimum particulars needed to identify the affirmative defense in question." *Trevino v. RDL Energy Servs., L.P.*, 2017 U.S. Dist. LEXIS 46716, at *15 (S.D. Tex. 2017)(collecting cases).

[14] The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right." *See Roberts v. Overby-Seawell Co.*, Civil Action No. 3:15-CV-1217-L, 2018 U.S. Dist. LEXIS 47821, at *38-39 (N.D. Tex. 2018), *citing Tenneco Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996).

[15] See *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, Civil Action No. 3:04-CV-1866-D, 2007 U.S. Dist. LEXIS 62105, at *29-30 (N.D. Tex. 2007) ("Under Texas law, release is an affirmative defense on which [Defendant] will have the burden of proof at trial." "[I]n order to establish [its] affirmative defense of release, the [defendant] must prove the elements of a contract").

[16] Equitable estoppel requires a showing of five elements: (1) a false representation or concealment of material facts; (2) made with either actual or constructive knowledge of the truth; (3) to a party without knowledge of the truth or without the means of knowing the truth; (4) with the intention that the false representation or concealment should be acted on; and (5) the party to whom it was made actually relied on or acted on it to his prejudice. *Gulbenkian v. Penn*, 151 Tex. 412, 418, 252 S.W.2d 929, 932 (1952)

[17] Under Texas law, the defense of laches rests on two elements: (1) an unreasonable delay in bringing a claim although otherwise one has the legal or equitable right to do so, and (2) a good faith change of position by another, to his detriment, because of this delay." *Nautilus Ins. Co. v. S. Vanguard Ins. Co.*, 899 F. Supp. 2d 538, 549 (N.D. Tex. 2012)

[18] Under the doctrine of *in pari delicto,* actions brought on illegal or corrupt bargains cannot prevail if the plaintiff was a significant participant in the wrongdoing, bearing at least equal fault. *See Asarco LLC v. Ams. Mining Corp.*, 396 B.R. 278, 429-30 (S.D. Tex. 2008), *citing Pinter v. Dahl*, 486 U.S. 622, 632, 108 S. Ct. 2063, 100 L. Ed. 2d 658 (1988).

judgment, the moving party is not required to present evidence proving the absence of a material fact issue; rather, the moving party may meet its burden by simply 'pointing to an absence of evidence to support the nonmoving party's case").

28.    Furthermore, in their affirmative Original Counterclaims and Third-Party Claims, the STK Group has alleged claims for (i) fraudulent inducement;[19] (ii) fraudulent concealment;[20] (iii) negligent misrepresentation;[21] (iv) breach of the Lease;[22] (v) breach of an unidentified second contract allegedly formed October 2016; and (vi) declaratory judgment. As it pertains to counterclaims (i)-(iii) and (v), the Defendants have no evidence of any of the elements of such counterclaims. As it pertains to Counterclaim (iv), Defendants have no evidence of any breach of the Lease by Plaintiff.  As Defendants carry the burden of proof on each of their claims, and as the discovery deadline expired on April 30, 2018, their counterclaims should be dismissed in their entirety under FED. R. CIV. P. 56.

---

[19] To recover on an action for fraud or fraudulent inducement, a party must prove that (1) a material representation was made, (2) the representation was false, (3) when the representation was made, the speaker knew the representation was false or made it recklessly without knowledge of the truth as a positive assertion, (4) the representation was made with the intention that it should be acted upon by the party, (5) the party acted in reliance upon it, and (6) the party thereby suffered injury. *Siddiqui v. Fancy Bites, LLC,* 504 S.W.3d 349, 369 (Tex. App.—Houston [14th Dist.] 2016, pet. denied), *reh'g overruled* (Oct. 6, 2016).

[20] The elements of fraud by nondisclosure are (1) the defendant failed to disclose facts to the plaintiff, (2) the defendant had a duty to disclose those facts, (3) the facts were material, (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts, (5) the defendant was deliberately silent when it had a duty to speak, (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting, (7) the plaintiff relied on the defendant's nondisclosure, and (8) the plaintiff was injured as a result of acting without that knowledge. *Horizon Shipbuilding, Inc. v. BLyn II Holding, LLC,* 324 S.W.3d 840, 850 (Tex. App.—Houston [14th Dist.] 2010, no pet.). However, where not legally bound to volunteer information, a person is not to be charged with fraud in suppressing it. *Moore & Moore Drilling Co. v. White,* 345 S.W.2d 550, 555 (Tex. Civ. App.—Dallas 1961, writ ref'd n.r.e.) and, the suppression of information can only be fraud where if there is no equal opportunity of discovering the truth.

[21] In Texas, the elements of a negligent misrepresentation claim are: (1) defendant's representation to plaintiff in the course of defendant's business or in a transaction in which the defendant had an interest; (2) defendant's providing false information for the guidance of others; (3) defendant's failure to exercise reasonable care or competence in obtaining or communicating information; (4) plaintiff's justifiable reliance on defendant's representation; and (5) defendant's negligent misrepresentation proximately causing the plaintiff's injury. *Willis v. Marshall,* 401 S.W.3d 689, 698 (Tex. App.—El Paso 2013, no pet.).

[22] A breach of contract claim requires proof of the following elements: "(1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) resulting damages to the plaintiff." *Kinetic Concepts, Inc. v. BlueSky Med. Corp.,* No. SA-03-CA-0832-RF, 2005 U.S. Dist. LEXIS 32196, at *15 (W.D. Tex. 2005)

**D.      Additionally and/or Alternatively, each of the Defendants' counterclaims based upon the alleged "parking issue" are barred by the express terms of the Lease and Guaranty**

29.      The first time the Defendants complained that the Plaintiff or the Third-Party Defendants somehow misrepresented the potential lack of parking availability at or around the Property came only *after* it became clear that the Defendants had no intention or ability to fulfill their own financial obligations under the Lease and the Guaranty.  These claims, however, completely ignore the express terms of the Lease and the parties' explicit treatment of the parking contingency therein.  Moreover, the fact that STK paid rent under the Lease for several months (and well past the Initial Contingency Period)  without complaint is clear evidence that the claims premised upon misrepresentations related to parking were manufactured without factual basis or support.[23]

30.      It is worth reiterating that the Lease contains the following provisions related to the Property and the parties' obligations and acknowledgements related thereto:

(i) a specific statement that "Tenant hereby agrees and acknowledges that the Demised Premises **may not contain sufficient parking** for its Permitted Use;" (Exhibit 2-A at Section 3.2)

(ii) a 60-day contingency period lasting until August 3, 2015, during which STK Group could continue to conduct whatever investigations it desired and a unilaterally terminate the Lease and Guaranty without liability, if they determined that the Premises could not meet their need; (Exhibit 2-A at Section 2.2)

(iii) conspicuous "entirety of agreement' and "disclaimer of reliance" clauses which expressly disclaimed any prior representations not expressly set forth in the Lease; (Exhibit  2-A at Sections 28.13-28.14) and

---

[23] Exhibit 1-1; Exhibit 3, at ¶ 7.

(iv) an agreement that STK Group took the Premises in its "as-is" condition and acknowledged that it had previously inspected the premises to its satisfaction. (Exhibit 2-A at Section 3.1 and Exhibit 2-B).

31.     Simply put, at the time they executed the Lease and the Guaranty, the STK Group knew about the existence of the potential lack of parking, took the parking at the Property "as is" and expressly without reliance on any outside information or representation related to the parking; and had their 60-day opportunity to investigate the parking and terminate without material penalty if they determined that parking made their business somehow unfeasible.

32.     The above provisions are important because the show that, in the first place, STK Group had actual express knowledge of the parking contingency *and* possessed the specifically negotiated Initial Contingency Period in which they could have performed whatever evaluation it desired. These terms demonstrate that any reliance on any alleged "misrepresentation" or "concealment" related to insufficient parking could not have been reasonable, as is required for a claim of fraudulent inducement, fraud by non-disclosure, and negligent misrepresentation. *See e.g.*, *Camden Mach. & Tool, Inc. v. Cascade Co*., 870 S.W.2d 304, 311 (Tex. App.—Fort Worth 1993, no writ)  ([A] party who has actual knowledge of specific facts cannot have relied on a misrepresentation of the same facts); *Chitsey v. Nat'l Lloyd's Ins. Co.*, 698 S.W.2d 766, 769 (Tex. App.—Austin 1985)("Moreover, when one makes his own investigation of the facts, he cannot, as a matter of law, be said to have relied upon the misrepresentations of others").

33.     Moreover, the terms show that STK Group, which held itself out a sophisticated business operator prior to contracting, accepted the Property "as is" and validly disclaimed any reliance on pre-existing representations related to the parking. Such contractual disclaimers of

reliance are routinely upheld under Texas law,[24] and certainly should be in this case where the evidence shows that the potential of insufficient parking was a known at the time of contracting.[25]  And although unnecessary for the granting of this Motion for Summary Judgment, STK's attempted payment of the monthly rental obligations between March and May 2016 also demonstrate the lack of any alleged misrepresentation or reliance on any alleged statement regarding the parking.

34.     Since Defendants (by their own admissions under the Lease) and the WC Group (for the reasons set forth in this Motion) have affirmatively negated the essential element of justifiable reliance, Defendants' Counterclaims and third-party claims of fraud, negligent misrepresentation, and breach of contract premised on the parking must be denied as a matter of law.

### E.     Additionally and/or Alternatively, Plaintiff fulfilled its only obligation under the Lease related to Parking

35.     Defendants breach of contract counterclaim based upon the allegation that Plaintiff failed to provide needed assistance on parking is without factual support.  The Plaintiff

---

[24] Compare Section 28.14 of the Lease to the disclaimer of reliance provisions found in *Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997) and *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51 (Tex. 2008) with the standard  "merger" clause found *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011)

[25] *See e.g., Birnbaum v. Atwell*, No. 01-14-00556-CV, 2015 Tex. App. LEXIS 8775, at *17 (App.—Houston [1st Dist.] Aug. 20, 2015)("We have upheld the validity of an "as is" clause where the parties to the agreement were equally sophisticated, particularly when the buyer had the opportunity to inspect the premises before purchase"), *citing Bynum v. Prudential Residential Servs., L.P.*, 129 S.W.3d 781, 789 (Tex. App.—Houston [1st Dist.] 2004, pet. denied); *see also Rader v. Danny Darby Real Estate, Inc.*, No. 05-97-01927-CV, 2001 Tex. App. LEXIS 6198, 2001 WL 1029355, at *4 (Tex. App.—Dallas Sept. 10, 2001, no pet.); *see also Cronus Offshore, Inc. v. Kerr McGee Oil & Gas Corp.*, 369 F. Supp. 2d 848, 859 (E.D. Tex. 2004) ("Furthermore, through the disclaimer and waiver provisions, Kerr McGee disclaimed and Cronus waived reliance on any representations or warranties made by Kerr McGee with regard to the condition of the assets. In addition, Kerr McGee sold and Cronus accepted the property and the appurtenances thereto "as is with all faults." Moreover, in the property review clause, Cronus represented that in entering into and performing the Purchase Agreement, it had relied solely on its own independent investigation and judgment with respect to the assets and their value. Finally, in the merger clause, the parties agreed that the Purchase Agreement constituted the entire agreement with respect to the transactions described and it superseded any prior oral or written agreements or information furnished by Kerr McGee to Cronus. **Texas courts have, on numerous occasions, recognized the validity and enforceability of such exculpatory clauses when faced with allegations of fraudulent misrepresentation and/or fraudulent concealment**") (emphasis added).

had a single responsibility when it came to parking under the Lease: "Landlord covenants and agrees, **at the request of Tenant** but at no cost to Landlord, to assist Tenant in identifying and locating offsite parking and valet parking service providers for the Demised Premises." [emphasis added] The Defendants cannot show that they ever made a request for assistance in identifying offsite parking and valet parking service providers, or that the Plaintiff failed to provide the requisite assistance, and it was Defendants own lack of diligence during the Initial Contingency Period that led to the inability to secure arrangements for parking necessary for the operation of their restaurant.

36.     Given these facts, there is no evidence that Plaintiff breached the Lease and such claim should be denied on this additional basis.

## F.     Additionally and/or alternatively, Defendants' counterclaim for negligent misrepresentation is barred by the statute of limitations

37.     Under Texas law, the statute of limitations for negligent misrepresentation claims are two years. *Texas Soil Recycling, Inc. v. Intercargo Ins. Co.*, 273 F.3d 644, 649 (5th Cir. 2001). In its claim for damages related to negligent misrepresentation, STK Group avers that "between January and August 2015," Counterclaim Defendants made certain representations related to the sufficiency of parking at the Premises. (ECF 21 at ¶66) STK Group further alleges that they relied on such representations "in entering into the Lease and the Guaranty and in waiving the general contingency."  (ECF 21 at ¶70) As a result the cause of action for negligent misrepresentation accrued when the Lease and Guaranty were entered into on June 5, 2015 or, at the latest, at the time that the contingency was waived on August 3, 2015.

38.     A cause of action generally accrues when facts come into existence that authorize a claimant to seek a judicial remedy, even if the fact of injury is not discovered until later, such as when a party to a contract suffers a "pecuniary loss." *Wilkins v. Chesapeake Expl. Ltd.*

*P'ship*, No. 9:09CV128, 2011 U.S. Dist. LEXIS 107060, at *39 (E.D. Tex. 2011). "In most cases, a cause of action accrues when a wrongful act causes an injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur." *Heller Healthcare Fin. v. Boyes*, Civil Action No. 3:00-CV-1335-D, 2002 U.S. Dist. LEXIS 12755, at *10 (N.D. Tex. 2002). Any "pecuniary loss" experienced by the STK Group would have arisen, at the latest, at the expiry of the contractually agreed "contingency period," at the time the "rent commencement date" became operational and fully enforceable under the Lease. That date was August 3, 2015, more than two years prior to the filing of STK Group's counterclaims.

39.     The discovery rule is additionally inapplicable to the negligent misrepresentation claim, because the express terms of the Lease Agreement, and the STK Group's obligation and opportunity to perform its own due diligence thereunder, definitively bar its operation of the "discovery rule" in this instance, because any alleged insufficiency of available parking would have been discoverable had the STK Group performed its investigation during the contractual contingency period as agreed. *See* S.V. v. R.V., 933 S.W.2d 1, 15 (Tex. 1996) ( "… for the discovery rule to apply a plaintiff's claim must be inherently undiscoverable and objectively verifiable"). Therefore, any claim for negligent misrepresentation should be denied.

    **G.**    **The Economic Loss Rule bars any fraud or negligent misrepresentation counterclaim for conduct occurring after the execution of the Lease**

40.     The economic loss rule provides deference to a contract between parties and precludes actions to recover damages outside the contract when the harm only consists of the same economic loss. *See Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716 (Tex. 2014) (Precluding recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy); *LAN/STV v. Martin K. Eby Const. Co.*, 435 S.W.3d 234, 235–44 (Tex. 2014)

(Economic loss rule applied to preclude general contractor from recovering the increased costs of performing its construction contract with the owner in a tort action against the project architect for negligent misrepresentations in the plans and specifications).   "Texas has recognized that, where the damages claimed are (as here) economic loss to the subject of the contract itself, the remedy ordinarily is one of contract alone."  *Med. Components, Inc. v. Osiris Med., Inc.*, No. EP-15-CV-305-PRM, 2016 U.S. Dist. LEXIS 183370, at *19-20 (W.D. Tex. 2016), *citing Kevin M. Ehringer Enters., Inc. y. McData Service Corp.*, 646 F.3d 321, 325 (5th Cir. 2011).

41.     To determine whether the economic loss rule applies, Courts consider both (i) the source of the defendant's duty to act (whether it arose solely out of the contract or from some common-law duty) and (i) the nature of the remedy sought by the plaintiff.  *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc*., 960 S.W.2d 41, 45 (Tex. 1998).  A decision from the District Court in the Western District of Texas has previously held that allegations of fraud based upon a defendant's representation that it would use "best efforts" contained within a contractual agreement are specifically barred by the economic loss rule.  *Med. Components, Inc.*, 2016 U.S. Dist. LEXIS 183370 at *20.

42.     To the extent the STK Group contends that a cause of action for fraudulent concealment and/or negligent misrepresentation could have arisen based upon unspecified representations related to parking "between January and August 2015," any such claims arising *after* the execution of the Lease would be barred by the economic loss doctrine, because the Defendants cannot prove any facts showing the existence of a legal duty or a remedy arising from outside STK Group and WC 1899's contractual relationship. There are none.

43.     Specifically, to the extent STK Group's Second and Third Counterclaims are based upon the allegation that "Counterclaim and Third-Party Plaintiffs would not have waived

the Lease's Initial  Contingency Period had they known that parking sufficient for use of the Premises were not in fact available,"[26] such claims could only arise solely and directly from the alleged duties owed between the parties to the Lease and the Guaranty during the contractual contingency period.

44.     Because the Defendants cannot show the existence of any extra-contractual duty violated by any member of the WC Group after the execution of the Lease, and because the Defendants have no evidence of any damages they may have suffered separate and apart from their (baseless) claim for breach of contract occurring after such times, any claim for fraud or negligent misrepresentation based upon any statements alleged to have occurred after June 5, 2015 should be denied.

**H.     The duplicative declaratory judgment claim for relief should be denied.**

45.     In STK Group's counterclaim for declaratory judgment, STK Group apparently seeks a declaration that "no rent is due and payable" (ECF 21 at ¶90) due to the failure of a condition precedent, namely "STK's inability to comply with local parking regulations" (ECF 21 at ¶89).   In STK Group's Answer (ECF 15), it filed affirmative defenses which included "Plaintiff's claims [for payment of rent] fail as Plaintiff has not satisfied all conditions precedent." (ECF 15 at p. 7)

46.     A cause of action for declaratory judgment that merely restates a party's defenses is insufficient, and dismissing counterclaims is appropriate when they do not seek relief different from the defendant's affirmative defenses. *Zytax, Inc. v. Green Plains Renewable Energy, Inc*., CIV.A.H-09-2582, 2010 WL 2219179, at *7 (S.D. Tex. May 28, 2010).   Because a determination of whether or not Defendants are liable for the hundreds of thousands of dollars of rent they have failed to pay will already be resolved as part of the claims in the lawsuit (namely

---

[26] ECF 21 at ¶¶62, 71.

Plaintiff's Count 1 "Breach of Lease" for non-payment, and Count 2 "Breach of Guaranty" for non-payment), the Defendants' Counterclaim Six for declaratory judgment should be dismissed as unnecessarily duplicative. However, and to the extent necessary, Defendant's counterclaim for declaratory judgment that no rent is due should also be denied for all the reasons that Plaintiff's affirmative claim for breach of contract should be granted.

### V.      CONCLUSION AND PRAYER

Because there are no genuine disputes as to any material fact, the WC Group requests that pursuant to FRCP 56 that the Court:

1.      Grant Plaintiff a judgment in the amount of $1,525,250.97, against each of the Defendants, jointly and severally for their breach of contract claims and for attorneys' fees and costs in the amount $66,000, with interest at the highest non-usurious rate of interest allowed under applicable Texas law not to exceed 1 and 1/2 % per month until paid;

2.      Deny Defendants any relief as a result of their counterclaims and third-party claims; and

3.      Grant the WC Group such other and further relief as they may show themselves justly entitled.

Alternatively, if the Court fails to grant the entirety of the Motion for Summary Judgment, the WC Group respectfully requests that this Court enter an order that determines any material fact that is not genuinely in dispute and treating such facts as established for trial pursuant to FRCP 56(g).

Respectfully submitted,

WALLER LANSDEN DORTCH & DAVIS, LLP

By: _/s/ Eric J. Taube_____
      Eric J. Taube
      State Bar No. 19679350
      Andrew P. Vickers
      State Bar No. 24064975
      100 Congress Avenue, Suite 1800
      Austin, Texas 78701
      (512) 685-6400
      (512) 685-6417 (FAX)
      eric.taube@wallerlaw.com
      andrew.vickers@wallerlaw.com

ATTORNEYS FOR,
WC 1899 MCKINNEY AVENUE, LLC, NATIN
PAUL, SHEENA PAUL AND WORLD CLASS
CAPITAL GROUP, LLC

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the foregoing document has been served upon those parties receiving the Court's ECF e-mail notification on this 8th day of June, 2018, including counsel for Defendants listed below:

Michael Goldman
GOLDMAN LAW, PC
One Energy Square
4925 Greenville Ave., Ste. 200
Dallas, Texas 75206
(972) 850-8490
(972) 692-07265 (fax)
michael@goldmanlawpc.com

Farhad Novian
Novian & Novian, LLP
1801 Century Park East, Suite 1201
Los Angeles, CA 90067
farhad@novianlaw.com

                  _/s/ Eric J. Taube_____
                  Eric J. Taube