FILED

2019 MAY 13 PM 3:52

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
           DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

**WC 1899 MCKINNEY AVENUE, LLC,**
        **Plaintiff/Counter-Defendant,**

-vs-

**STK DALLAS, LLC, and THE ONE
GROUP HOSPITALITY, INC.,**
        **Defendants/Counter-Plaintiffs,**

-vs-

**WORLD CLASS CAPITAL GROUP, LLC,
NATIN PAUL, and SHEENA PAUL,**
        **Third-Party Defendants.**

**CAUSE NO.:
AU-17-CA-00687-SS**

## ORDER

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically WC 1899 McKinney Avenue, LLC, World Class Capital Group, LLC, and Natin and Sheena Paul (collectively, World Class)'s Motion for Summary Judgment [#79], STK Dallas, LLC and The One Group Hospitality, Inc. (collectively, STK)'s Response [#82] in opposition, and World Class's Reply [#92] in support.[1] Having reviewed the documents, the governing law, the arguments of counsel, and the file as a whole, the Court now enters the following opinion and orders.

## Background

This dispute concerns a lease agreement between World Class and STK. STK is a restaurant group that sought to open a restaurant in Dallas, Texas. Resp. [#82-1] Segal Decl.

---

[1] The Court grants the parties' related motions to file documents under seal. *See* STK Motion to Seal [#83]; World Class Motion to Seal [#100].

at 1.[2] Towards that end, STK entered into discussions with World Class in 2014 regarding a potential lease of retail space at 1899 McKinney Avenue (the Premises). *Id.*

## I.     Lease Negotiations

During the lease negotiations, STK discovered the Premises lacked onsite parking and expressed concern about its ability to secure nearby offsite parking for its planned restaurant. Mot. Summ. J. [#79] at 106. In an attempt to allay these concerns, World Class undertook a search for offsite parking in early 2015. Internal emails exchanged within World Class around that time suggest World Class had considered eight possible parking lots in the vicinity, of which four were unavailable. Mot. Seal [#83-1] Ex. A at 2–6. World Class concluded the other four lots were likely only available on a month-to-month basis "if they are available at all." *Id.*

By May 2015, neither party had identified a parking solution, and on May 17, 2015, STK proposed "add[ing] a contingency [to the proposed lease agreement] for finding acceptable offsite parking for intended use" because "[o]perations has not had a chance to secure a lot." Segal Decl. at 8–9. World Class responded that there was "plenty of parking nearby in garages and surface lots" and assured STK that it would "help in any way as needed." *Id.* But World Class resisted adding a parking contingency to the Lease Agreement on the ground that the addition of another contingency would "throw a monkey wrench in execution." *Id.* STK ultimately conceded and informed World Class that it was "okay forgoing a parking contingency" but asked World Class to provide information on "the company that provided parking services for the previous tenant." Segal Decl. at 12.

---

[2] In the interest of consistency, all page number citations refer to CM/ECF pagination.

## II.    The Lease Agreement

The Lease Agreement and a corresponding Guaranty Agreement were executed by the parties on June 5, 2015, and several of their provisions are relevant here. Mot. Summ. J. [#79] Ex. 2-A (Lease Agreement) at 62; Am. Compl. [#14] at 52–53 (Guaranty Agreement).

First, the Lease Agreement contains an "as-is" clause specifying that the Premises were to be leased "as-is" and without reliance upon any warranty as to the fitness of the Premises for any particular purpose. Lease Agreement § 3.1. The "as-is" clause does, however, require World Class to deliver the Premises to STK "in compliance with" all local codes and regulations. *Id.*

Second, the Lease Agreement contains a parking disclaimer clause. Lease Agreement § 3.2. Under the terms of that clause, STK acknowledged and agreed that the Premises "may not contain sufficient parking" for the Premises's intended use. *Id.* In turn, World Class agreed "at the request of [STK] but at no cost to [World Class], to assist [STK] in identifying and locating offsite parking." *Id.*

Third, the Lease Agreement contains a provision establishing a contingency period. Under the terms of that provision, if the Premises were unable to be operated for their intended use because STK cannot "obtain the necessary permits" despite using "commercially reasonable best efforts," STK could terminate the Lease Agreement so long as STK provided written notice on or before August 3, 2015. Lease Agreement § 2.2(ii).[3]

Fourth and finally, the Lease Agreement contains provisions affecting the timing of STK's rent obligations. Under Lease Agreement § 1.1(i), the Rent Commencement Date falls on the earlier of (i) the date on which STK opened its restaurant to the public, or (ii) February 1,

---

[3] *Cf.* Mot. Summ. J. [#79] Ex. 3 (Natin Paul Decl.) at 106 ("[T]he parties specifically negotiated a provision regarding the right of STK and The One Group to investigate whether there was appropriate parking[,] . . . even though Mr. Segal represented to me that he believed that he had already obtained sufficient parking prior to finalize [sic] the Lease.").

2016, "subject to extension as provided for in Section 28.18." In turn, Lease Agreement § 28.18 provides the Rent Commencement Date "shall be extended by one day for each such day of delay" caused by a "Force Majeure Event." The Lease Agreement defines a "Force Majeure Event" as "any delay[] due to strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations or restrictions or any other causes of any kind whatsoever which are beyond the reasonable control of such party." *Id.* § 28.6.

## III.   Parking Problems

After the parties signed the Lease Agreement, subsequent attempts to locate offsite parking failed. *See* Segal Decl. at 2 ("In July 2015, One Group retained Lone Star, a parking consulting company, to assist in securing the deeded parking spaces needed for operation of a restaurant . . . [but] [n]either One Group nor its consultants were ever able to secure the required number of deeded parking spaces under Dallas' local codes and regulations . . . ."). Yet, in spite of the obvious obstacle the parking situation posed to opening a restaurant, STK failed to provide written notice within the contingency period of intent to terminate the Lease Agreement. *See* Segal Decl. at 3. STK also failed to pay its rent, and in March 2016, STK received a letter from World Class demanding that STK begin paying rent due under the terms of the Lease Agreement. *Id.* STK Group then made two rent payments to World Class "in the hopes that the needed parking would be found." *Id.*

The needed parking was not found. In April 2016, STK informed World Class it was "unable to get car parking," that it had not received any substantial assistance from World Class,[4] and that the City of Dallas (the City) was unwilling to grant STK a parking variance. Segal Decl.

---

[4] *Cf.* Segal Decl. Ex. E at 17 (Sheena Paul: "We have been working with local counsel . . . to prepare for the parking variance we will need . . . . I think it will be best for us to coordinate efforts on parking; . . . most of the application will need to be spearheaded by STK but will be supported and reinforced by Landlord.").

at 3. As a result of these obstacles, STK concluded it could not proceed with the restaurant and ceased making rent payments to World Class. *Id.*

Around the same time, STK learned a prior lessee had encountered similar parking problems and had applied for a parking variance from the City. *Id.* at 3–4. In conjunction with the parking variance application, the prior owner of 1899 McKinney Avenue had written a letter to the City asserting the owner had "tried in vain" to secure an offsite parking agreement but had been unable to do so. Segal Decl. at 4. Despite this entreaty, the City had denied the variance application in January 2014. *Id.*

In October 2016, World Class and STK arranged an in-person meeting to discuss how to proceed. Segal Decl. at 4. STK alleges the parties agreed at this meeting that if they were unable to secure parking or a variance for operation of the restaurant, the parties would cancel the Lease Agreement and "walk[] away with no claim on the other." *Id.*

## IV. Procedural Posture

Notwithstanding the parties' alleged agreement to cancel the Lease Agreement if parking could not be found, World Class filed suit in May 2017 alleging breach of contract. Notice Removal [#1-1] Ex. A (Pet.) at 13–14. STK then removed the action to this Court on the basis of diversity jurisdiction and filed counterclaims alleging fraud in the inducement, fraudulent concealment, negligent misrepresentation, and breach of contract. Not. Removal [#1] at 2–3; Countercls. [#21] at 10–15. World Class responded by asserting a fraud claim against STK alleging STK had misrepresented its "attention to detail" and financial condition when, in reality, it "could not meet the obligations under the Lease . . . [and] Guaranty." [#48] at 14–15. World Class now moves for summary judgment on its breach of contract claims as well as on STK's

affirmative defenses and counterclaims. Mot. Summ. J. [#79]. This pending motion is ripe for review.

**Analysis**

## I.    Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing

6

summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*

"Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## II. Application

World Class contends it is entitled to summary judgment on its breach of contract claims as well as STK's counterclaims and affirmative defenses. Mot. Summ. J. [#79] at 1. The Court first considers the parties' breach of contract claims and counterclaims. It then turns to STK's affirmative defenses and noncontractual counterclaims.

### A. Breach of Contract

In order to prevail on a breach of contract claim, the plaintiff must establish (1) a valid contract existed; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff sustained damages as a result of the breach. *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.).

The parties raise four separate breach of contract claims: (1) World Class alleges STK breached the Lease Agreement; (2) STK alleges World Class breached the Lease Agreement; (3)

World Class alleges One Group breached the Guaranty Agreement; and (4) STK alleges World Class breached a subsequent oral agreement that STK and World Class would cancel the Lease Agreement if STK could not find parking. The Court examines each of these claims in turn.

### 1.    Breach of Lease Agreement by STK

World Class argues it is entitled to summary judgment on its claim that STK breached the Lease Agreement. Mot. Summ. J. [#79] at 10–11. In response, STK argues summary judgment is inappropriate because there is a genuine issue of material fact as to (1) whether a valid contract exists; (2) whether World Class performed or tendered performance; (3) whether STK breached the Lease Agreement; and (4) the amount of damages sustained by World Class. Resp. [#82] at 17–23.

### a.    Existence of a Valid Contract

First, STK argues there is a genuine issue of material fact as to whether a valid contract exists because there is a factual question as to whether World Class fraudulently induced STK Group to sign the Lease and Guaranty Agreements by reassuring STK that there was "plenty of parking nearby in garages and surface lots." Resp. [#82] at 17–18. This argument misses the mark because fraudulent inducement does not preclude formation of a valid contract. To the contrary, fraudulent inducement "is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof." *Haase v. Glazner*, 62 S.W.3d 795, 798–99 (Tex. 2001).

Second, STK argues there is a genuine issue of material fact as to whether a valid contract exists because there is a factual question as to whether performance was impossible. Resp. [#82] at 19. This argument also fails. Though impossibility can serve as an affirmative defense to a breach of contract claim, STK does not explain whether or how impossibility

prevents formation of a contract. *See* Resp. [#82] at 19 (arguing impossibility "relieves a party *to a contract* of its duties" (emphasis added)). The Court therefore concludes STK has failed to carry its burden of persuasion on this argument.

Finally, STK argues there is a genuine issue of material fact as to whether a valid contract exists because there is a factual question as to whether World Class failed to deliver the premises "in compliance with all local codes and regulations . . . with respect to the permitted use." Resp. [#82] at 17; Lease Agreement § 3.1. But this argument goes towards whether World Class performed under the Lease Agreement—by delivering the premises—and has no bearing on whether or not a valid contract existed in the first place. And in any event, STK fails to identify any code or regulation as to which the Premises were noncompliant. *See* Resp. [#82] at 17, 19–20 (arguing that World Class must have failed to deliver the premises because "operation of a restaurant . . . is impossible under applicable laws and regulations."). In light of these deficiencies, the Court concludes that STK has failed to carry its burden of persuasion as to this argument.[5]

**b.    Performance**

In addition to arguing that World Class failed to perform by failing to deliver the premises, STK also argues that World Class failed to perform by "failing to cooperate" with STK's efforts to seek permits and failing to assist STK in identifying and locating offsite parking. Resp. [#82] at 20; *see also* Lease Agreement at §§ 2.2(i), 3.2. But STK does not offer

---

[5] Even setting aside STK's failure to carry its burden of persuasion on this argument, the Court concludes there is no genuine issue of material fact as to World Class's delivery of the premises to STK in compliance with applicable local rules and regulations. STK suggests World Class did not deliver the premises in compliance with local rules and regulations because the premises did not contain sufficient parking. *See* Resp. [#82] at 17, 19–20. But STK has not identified any local rule or regulation requiring the premises to contain sufficient onsite parking, and presumably for this reason, the Lease Agreement explicitly contemplated a search for offsite parking. Lease Agreement § 3.2. Because there is no suggestion that local rules and regulations required onsite parking and because the Lease Agreement did not require World Class to deliver offsite parking in conjunction with its delivery of the premises, the Court concludes there is no genuine dispute that World Class did, in fact, perform by delivering the premises under the terms of the Lease Agreement.

any details as to how World Class failed to cooperate with STK's efforts to seek permits for its restaurant. *See* Resp. [#82] at 20–21. What's more, STK acknowledges that World Class did assist STK, at least to some degree, in its efforts to identify offsite parking. *See id.* at 22 (conceding that World Class "provid[ed] a list of parking lots in the area).

STK implies World Class should have gone to greater lengths to assist STK in its efforts to find parking and alleges that World Class (1) failed to respond when STK asked for "any information [World Class may have] on the company that provided parking services for the previous tenant"; (2) was slow to respond to emails requesting assistance locating parking; (3) "merely provid[ed] a list of parking lots in the area" when STK asked for assistance locating parking in April 2016; and (4) failed to provide assistance when STK asked for additional help locating parking in October 2016. *See* Resp. [#82] at 20–21. Yet the Lease Agreement does not require World Class to use best efforts or even commercially reasonable efforts in assisting STK's efforts to find parking. *Compare* Lease Agreement § 3.2 (requiring World Class to "assist in identifying and locating offsite parking" but "at no cost" to World Class), *with* Lease Agreement § 2.2(ii) (requiring STK to use "commercially reasonable best efforts" to open and operate its restaurant). Further, even if the Lease Agreement was interpreted to require best efforts on the part of World Class, that requirement would be unenforceable because under Texas law, best efforts provisions must "provide some kind of objective goal or guideline against which performance is to be measured[.]" *Kevin M. Enringer Enters., Inc. v. McData Servs. Corp.*, 646 F.3d 321, 326–27 (5th Cir. 2011) (internal quotation marks omitted) (citing *Herrman Holdings, Ltd. v. Lucent Techs., Inc.*, 302 F.3d 552 (5th Cir. 2002); *CKB & Assocs. v. Moore McCormack Petroleum, Inc.*, 809 S.W.2d 577 (Tex. App.—Dallas 1991, writ denied)). The Lease Agreement contains no such guideline, *see* Lease Agreement § 3.2, and absent any further argument from

STK, the Court concludes there is no genuine dispute of material fact that World Class carried out its obligation under the Lease Agreement to assist STK in its efforts to identify offsite parking.

### c. Breach

STK argues it did not breach the Lease Agreement by failing to pay rent because the unavailability of offsite parking constitutes a "Force Majeure Event" triggering an indefinite postponement of the Rent Commencement Date. *See* Lease Agreement §§ 1.1(i), 28.18. World Class disagrees and argues the force majeure clause is only triggered by events that could not have been anticipated by the parties. Reply [#92] at 15.

The Lease Agreement defines a "Force Majeure Event" as "any delay[] due to strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations or restrictions or any other causes of any kind whatsoever which are beyond the reasonable control of such party." Lease Agreement § 28.6. The scope and effect of this force majeure clause "depend[] on the specific contract language[] and not on any traditional definition of the term." *Va. Power Energy Mktg. v. Apache Corp.*, 297 S.W.3d 397, 402 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); *see also Roland Oil Co. v. R.R. Comm'n of Tex.*, No. 03-12-00247-CV, 2015 Tex. App. LEXIS 1906, at *12–16 (Tex. App.—Austin 2015, pet. denied).

The Court concludes a fact question exists as to whether the unavailability of offsite parking constitutes a force majeure event forestalling STK's obligation to begin paying rent under the Lease Agreement. STK was delayed in opening its restaurant because it could not secure sufficient offsite parking to comply with local rules and regulations prescribed by the City. Segal Decl. at 3. Thus, STK was arguably delayed by both a cause "beyond the reasonable control" of STK—the unavailability of parking—as well as by "governmental laws,

regulations[,] or restrictions" which prohibited STK from operating a restaurant without such parking. *See* Lease Agreement § 28.6.

Though the unavailability of parking and the City's parking restrictions both satisfy the requirement that Force Majeure Events be beyond the reasonable control of both parties, World Class argues these circumstances nevertheless fall outside the scope of the clause because the clause implicitly excludes occurrences or causes which the party might have reasonably anticipated. Resp. [#82] at 15. To the extent the force majeure clause is ambiguous, World Class might be able to establish at trial that such an implicit limitation exists. The text of the clause, however, does not clearly and unambiguously require that Force Majeure Events be beyond the reasonable anticipation of the party seeking to delay the Rent Commencement Date. *See* Lease Agreement § 28.6; *cf. Roland Oil Co.*, 2015 Tex. App. LEXIS 1906, at *12–16 (finding similar force majeure clause to be unambiguous and "subject to only one reasonable interpretation[:] . . . any potential triggering event of the clause must be beyond the control of the party"). Thus, a fact issue exists as to whether the force majeure clause encompasses events anticipated by the parties and whether the unavailability of parking triggered the clause. This fact issue is material because if the clause was triggered by STK's inability to locate parking, then STK's obligation to pay rent never materialized and STK did not breach the Lease Agreement when it failed to pay rent to World Class.

In addition to arguing that STK breached the Lease Agreement by failing to pay rent, World Class also contends STK breached the Lease Agreement by failing to use commercially reasonable best efforts to open its restaurant and to avoid the placement of liens on the property. Mot. Summ. J. [#79]. But World Class does not provide any further argument or evidence in support of these contentions, and the Court concludes genuine issues of material fact exist as to

whether STK used commercially reasonable best efforts to open its restaurant and as to whether STK fulfilled its alleged obligation to avoid placement of liens on the property.

In light of the fact issues identified above, World Class is not entitled to summary judgment on its breach of contract claim.

### d. Damages

STK contends a fact issue exists as to damages because the damage calculations submitted by World Class contain improper items and fail to include offsets to which STK is entitled. *See* Resp. [#82] at 23 (alleging World Class "fail[ed] to account for the security deposit and other good faith rent payments" and improperly included items beyond the Guaranteed Minimum Rent in connection with damages claimed under the Guaranty Agreement). STK also alleges World Class failed to use reasonable efforts to mitigate its damages because World Class's "sole attempt to mitigate its damages" consisted of "posting a flyer for the property" on a real estate website. *Id.* at 23; Segal Decl. at 4. Although World Class argues STK has failed to adduce specific evidence creating a fact issue as to damages, the Court concludes a fact issue exists as to whether World Class used reasonable efforts to mitigate its damages.

### 2. Breach of Lease Agreement by World Class

STK argues there is a genuine issue of material fact precluding summary judgment on its breach of contract counterclaim because World Class failed to deliver the premises in compliance with all local codes and regulations. Resp. [#82] at 25–26. As the Court has already explained above, STK has failed to carry its burden of persuasion with respect to its argument that World Class failed to deliver the premises. *See supra* Section II.A.1.a. Because STK does not offer any further argument or evidence in support of its breach of contract counterclaim, the Court grants World Class's motion for summary judgment as to that claim.

### 3. Breach of Guaranty Agreement by STK

To recover on a breach of guaranty claim, a plaintiff must establish (1) "the existence and ownership of the guaranty contract"; (2) "the terms of the underlying contract by the holder"; (3) "the occurrence of the conditions upon which liability is based"; and (4) "the failure or refusal to perform the promise by the guarantor." *See, e.g., Lee v. Martin Marietta Materials Sw. Ltd.*, 141 S.W.3d 719, 720–21 (Tex. App.—San Antonio 2004, no pet.).

World Class contends it is entitled to summary judgment on its claim that One Group Hospitality breached the Guaranty Agreement. Mot. Summ. J. [#79] at 11. Yet because the Court has concluded a genuine issue of material fact exists as to whether STK incurred an obligation to pay rent under the Lease Agreement, a genuine issue of material fact also exists as to whether One Group Hospitality breached the Guaranty Agreement by failing to provide World Class with "full and prompt payment and performance" of STK's obligations under the Lease Agreement. *See* Guaranty Agreement; *see also Lee*, 141 S.W.3d at 720–21 ("To recover on a guaranty contract, a company must show . . . the occurrence of the conditions on which liability is based[.]"

### 4. Breach of October 18, 2016 Oral Agreement

STK contends World Class orally promised or agreed during an October 18, 2016 meeting that the parties would cancel the Lease Agreement and "walk[] away with no claim on the other" if the parties were unable to secure parking or a variance allowing operation of a restaurant on the Premises. Resp. [#82] at 26; *see also* Segal Decl. at 4. World Class argues it is entitled to summary judgment on this breach of contract claim because the Lease Agreement and Guaranty Agreement bar oral modification or termination of those agreements. Reply [#92] at

16. World Class also argues it is entitled to summary judgment because the statute of frauds requires a promise or agreement about the lease of real estate to be in writing. *Id.*

The Court concludes there is an issue of fact as to whether the Lease Agreement bars the oral agreement at issue here. Under Lease Agreement § 28.13, "no agreement shall be effective to change, modify or terminate" the Lease Agreement unless in writing and signed by the party against whom the change is asserted. Similarly, the Guaranty Agreement provides it "may not be changed, modified, discharged or terminated orally or in any manner other than by an agreement in writing signed by Guarantor and Landlord." Guaranty Agreement at 53. But STK does not contend the alleged oral agreement is effective to terminate the Lease Agreement. Rather, STK argues the parties entered into a predicate oral agreement to subsequently execute a termination of the Lease Agreement. *See* Resp. [#82] at 26; Segal Decl. at 4. While that subsequent termination of the Lease Agreement would have to be in writing to satisfy the contractual provisions identified above, the explicit text of these provisions does not unambiguously encompass the predicate oral agreement at issue here. To the extent these contractual provisions are ambiguous, a genuine issue of material fact exists as to whether the Lease Agreement and Guaranty Agreement bar enforcement of the oral agreement at issue here.

Further, the Court concludes the statute of frauds does not entitle World Class to summary judgment on this breach of contract claim. World Class argues the statute of frauds bars STK from asserting an oral agreement modifying or cancelling the terms of the Lease Agreement. Reply [#92] at 16. But because the statute of frauds is an affirmative defense, World Class must plead it before asserting it as a basis for summary judgment. FED. R. CIV. P. 8(c)(1). Since World class has not done so, *see* World Class Answer [#53] at 7, World Class is not

entitled to summary judgment on either its unpleaded affirmative defense or STK's breach of contract claim.

### B. Affirmative Defenses

STK asserts eight affirmative defenses: failure to mitigate damages, waiver, release, estoppel, laches, unclean hands, failure to satisfy a condition precedent, and fraudulent inducement. STK Answer [#15] at 7. World Class seeks summary judgment on all eight of these affirmative defenses on the ground that STK cannot marshal any evidence in support of these defenses. Mot. Summ. J. [#79] at 12. In its response, STK only addressed two of these affirmative defenses: failure to mitigate damages and fraudulent inducement. *See* Resp. [#82] at 23–25. The Court therefore grants summary judgment in favor of World Class on STK's unsupported affirmative defenses of waiver, release, estoppel, laches, unclean hands, and failure to satisfy a condition precedent. With respect to STK's affirmative defense of failure to mitigate damages, the Court concludes genuine issues of material fact preclude summary judgment at this time. *See supra* Section II.A.1.

That leaves only STK's affirmative defense of fraudulent inducement. In order to prevail on a fraudulent inducement claim, a defendant must establish (1) the plaintiff made a material representation that was false; (2) the plaintiff "knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth"; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff "actually and justifiably relied upon the representation and suffered injury as a result." *JPMorgan Chase Bank, N.A. v. Orca Assets G.P.*, 546 S.W.3d 648, 654 (Tex. 2018) (internal quotation marks omitted).

World Class contends it is entitled to summary judgment on this affirmative defense because STK cannot establish it justifiably relied on a representation made by World Class

regarding the availability of parking. Reply [#92] at 9–11. Specifically, World Class argues the Lease Agreement contained an "as-is" clause that barred STK from relying on any prior representation made by World Class. Mot. Summ. J. [#79] at 13–15. World Class also argues STK could not have justifiably relied on World Class's parking representations because the Lease Agreement contains specific provisions explicitly acknowledging the potential unavailability of parking. Reply [#92] at 9–11.

The Court concludes genuine issues of material fact preclude summary judgment on STK's affirmative defense of fraudulent inducement. As an initial matter, an "as-is" clause in a contract does not bar a party from asserting it was fraudulently induced to enter into that contract. See *Prudential Ins. Co. of Am. v. Jefferson Assocs.*, 896 S.W.2d 156, 162 (Tex. 1995) ("A buyer is not bound by an agreement to purchase something 'as is' that he is induced to make because of a fraudulent representation or concealment of information by the seller."). By contrast, an explicit, unambiguous contractual provision directly contradicting an alleged misrepresentation precludes a party from justifiably relying on that misrepresentation as a matter of law. *JPMorgan*, 546 S.W.3d at 658 ("As Texas courts have repeatedly held, a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." (cleaned up) (internal quotation marks and citations omitted)). Yet World Class has not identified a contractual provision directly contradicting the alleged misrepresentation relied on by STK. *Compare* Segal Decl. at 8 (assuring STK that there was "plenty" of *offsite* parking nearby), with Lease Agreement § 3.2 (acknowledging the Premises did not contain sufficient *onsite* parking). The Court therefore concludes World Class has failed to carry its burden of persuasion and denies summary judgment as to STK's affirmative defense of fraudulent inducement.

## C.    Remaining Counterclaims

The Court has already addressed STK's breach of contract counterclaims above. *See* Section II.A.3–4. In addition to those breach of contract counterclaims, STK also asserts counterclaims for fraudulent inducement, fraudulent concealment, and negligent misrepresentation. Countercls. [#21] at 10–13. World Class seeks summary judgment on each of these counterclaims. Mot. Summ. J. [#79] at 11–16.

First, World Class argues STK's fraud and negligent misrepresentation counterclaims are barred by an economic loss rule. Mot. Summ. J. [#79] at 18–19. Economic loss rules[6] operate to bar parties from recovering purely economic losses based on negligence or strict liability. *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 415 (2011). But "[t]ort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998). Thus, no economic loss rule applies to STK's fraud claims. And while an economic loss rule does apply to bar STK from recovering purely contractual economic losses such as benefit of the bargain damages, in this case, STK has sought reliance damages distinguishable from its claimed contractual damages. *See* Resp. [#82] at 18 ("[World Class's] representation resulted in substantial damages to STK Group in that it incurred approximately $672,674 in attempting to build out the restaurant on the property."); *id.* [#82-3] Siluk Decl. at 1; *see also Sterling Chems., Inc. v. Texaco, Inc.*, 259 S.W.3d 793, 797 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ("Under the economic loss rule, a plaintiff

---

[6] *See Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 415 (2011) ("[The economic loss rule] is something of a misnomer[] . . . as 'there is not one economic loss rule broadly applicable throughout the field of torts, but rather several more limited rules that govern recovery of economic losses in selected areas of the law.'" (quoting Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 WASH. & LEE L. REV. 523, 534–35 (2009))).

may not bring a claim for negligent misrepresentation unless the plaintiff can establish that he suffered an injury that is distinct, separate, and independent from the economic losses recoverable under a breach of contract claim."). The economic loss rule therefore does not bar STK from recovering on its negligent misrepresentation claim.

Second, World Class argues STK's fraudulent concealment counterclaim fails as a matter of law because World Class did not have a duty to disclose any information about parking. Reply [#92] at 11–13. In order to prevail on a claim of fraud based on concealment of a material fact, the party asserting the claim must establish it was ignorant of the fact and lacked an equal opportunity to discover the truth. *Bradford v. Vento*, 48 S.W.3d 749, 754–55 (Tex. 2001).

The Court agrees with World Class that STK did not have a duty to disclose information related to the availability of parking because STK had an equal opportunity to discover the truth about the availability of parking. Like World Class, STK had an opportunity before signing the Lease Agreement—and after signing the Lease Agreement but before expiration of the Contingency Period—to contact nearby parking lots and assess the feasibility of locating offsite parking. Similarly, although STK complains that World Class should have disclosed that a prior owner of the property had been unable to secure offsite parking, STK might have discovered this fact for itself by accessing publically available records. The Court therefore grants summary judgment in favor of World Class on STK's fraudulent concealment claim on the ground that World Class had no duty to disclose parking information STK had an equal opportunity to discover.

Third, World Class seeks summary judgment on STK's negligent misrepresentation counterclaim on the ground that claim is barred by the statute of limitations. Mot. Summ. J. [#79] at 17–18. World Class argues the statute of limitations has run because a cause of action accrues

19

for statute of limitations purposes when the claimant suffers a pecuniary loss. *Id.* World Class posits that STK must have suffered a pecuniary loss no later than August 3, 2015—the end of the contingency period—because that is the date on which STK became irrevocably liable for rent. *Id.* But, as explained above, a genuine issue of material fact exists as to whether the rent commencement date was postponed by the contract's force majeure clause. *See supra* Section II.A.1.c. Correspondingly, a fact issue exists as to the date on which STK first suffered a pecuniary loss by incurring an obligation to pay rent. Because it is unclear when STK first suffered a pecuniary loss, the Court concludes World Class has failed to carry its burden of persuasion on this argument. The Court therefore denies World Class's Motion for summary judgment as to this counterclaim.

### Conclusion

Genuine issues of material fact preclude summary judgment on World Class's breach of contract claims as well as on STK's claim that World Class breached an October 18, 2016 oral agreement to cancel the Lease Agreement if STK could not find parking. The Court also concludes factual issues preclude summary judgment on STK's fraudulent inducement counterclaim/affirmative defense and negligent misrepresentation counterclaim as well as STK's affirmative defense of failure to mitigate damages. But the Court grants summary judgment on STK's affirmative defenses of waiver, release, estoppel, laches, unclean hands, and failure to satisfy a condition precedent, on STK's fraudulent concealment counterclaim, and on STK's claim that World Class breached the Lease Agreement.

Accordingly,

IT IS ORDERED that STK's Motion to Seal [#83] is GRANTED;

IT IS FURTHER ORDERED that World Class's Motion to Seal [#100] is GRANTED;

IT IS FURTHER ORDERED that World Class's Motion for Summary Judgment [#79] is GRANTED IN PART and DENIED IN PART as described in this opinion; and

IT IS FURTHER ORDERED that World Class's Motion to Strike [#103] is DISMISSED AS MOOT because the evidence which World Class sought to strike did not alter or affect the Court's disposition of World Class's summary judgment motion; and

IT IS FINALLY NOTED that the Court's rulings herein are without prejudice to any potential evidentiary objections the parties may seek to raise at trial.

SIGNED this the _13th_ day of May 2019.

_Sam Sparks_

SAM SPARKS
SENIOR UNITED STATES DISTRICT JUDGE